**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harry CHRISTIAN (84–5843), Joe L. Davis (85–5005/85–5346),**
**Defendants-Appellants.**

**Nos. 84–5843, 85–5005 and 85–5346.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 31, 1986.

Decided March 13, 1986.

---

1. The parties filed cross-motions for summary judgment and agreed that no disputed issues of

fact remained unresolved.

Lionel R. Barrett, Jr. (argued), Nashville, Tenn., for Joe L. Davis.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Ross Alderman (argued), for the U.S.

Carol L. Solomon, Nashville, Tenn., Lionel R. Barrett, Jr. (argued), for Harry Christian.

Before CONTIE, Circuit Judge, PECK, Senior Circuit Judge and GIBSON, District Judge.*

CONTIE, Circuit Judge.

Joe L. Davis and Harry Christian appeal their convictions for distribution of heroin, 21 U.S.C. § 841(a)(1), and conspiracy to distribute heroin, 21 U.S.C. § 846, challenging the sufficiency of the evidence, several rulings on the admissibility of evidence, instructions to the jury, and sentencing. Defendant Davis appeals the district court's denial of his motion for a new trial based on the government's failure, pursuant to Davis' request, to disclose a government decision not to prosecute the government's chief witness in exchange for her cooperation in this case. For the reasons that follow, the judgments of the district court are affirmed.

**I.**

On April 19, 1984, defendants Joe L. Davis and Harry Christian were named in an indictment, which, in Count 1 alleged that Davis, Christian, Henry Edmondson, Wyndell Voorhies, John Johnson, and William Robinson did conspire to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 846. Count 3 charged that Davis distributed heroin on July 18, 1983 in violation of 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1). Counts 2, 4, and 8 alleged that Christian violated 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1) on June 28, 1982, September 22, 1983, and December 13, 1983, respectively.

On June 1, 1984, Davis filed a motion seeking to require the government to disclose all bargains and employment agreements with co-defendants or witnesses and the district court granted that motion. Trial was held July 20–31, 1984 and the following evidence was received.

Virginia Bowers testified that her husband Tyrone was on parole from the federal penitentiary and that she had agreed to cooperate with the Drug Enforcement Administration (DEA) in order to help her husband. Bowers agreed to buy drugs through contacts of her husband's. On July 28, 1982, Bowers told John Johnson she wanted to buy some brown heroin to sell it. Bowers testified that Johnson ini-

---

* The Honorable Benjamin F. Gibson, United States District Judge for the Western District of Michigan, sitting by designation.

tially wanted to take her to Curtis Christian rather than Harry Christian, because "Harry's dope wasn't any good." Johnson went into a house with $100, came out, and the two rode around for fifteen to twenty minutes. When the two returned, Christian was standing in the doorway. Johnson went into the house, which he said was Christian's, and then went to a car, a brown Mercury. Johnson opened the car door and returned with some brown powder. Bowers identified Christian in court. On cross-examination, Bowers indicated that she was parked about ten to fifteen feet from the door of Christian's house. Bowers testified that she had seen Christian before.

Bowers contacted Henry Edmondson on about July 18, 1983 and told him she wanted to buy some brown heroin. Bowers and Agent Bell of the Tennessee Bureau of Investigation met Edmondson and picked up Wyndell Voorhies, who indicated that they could get some drugs from Joe Davis but that he would not be home until 3:30 p.m. Voorhies and Edmondson went to Joe's mother's house, while Bell and Bowers sat in the car outside Wyndell's house. Wyndell came back and said that Davis was "fixing up the package." Wyndell returned with Davis, and Bowers went with them behind Wyndell's apartment. "I was handing the money to Joe and he said, no, not this time. Wendell took the money and he gave it to Joe and Joe gave him a package and Wendell handed me the package." Bowers returned to the car and gave the package to Agent Bell. Bowers testified that Joe's last name was "Davis" and she identified Davis in court.

Bowers indicated that her utility bills were paid by the government but that she was given no salary. Bowers indicated that she received checks of $50, $75, and $100 from the government when she was in a financial bind, but that the government never gave her anything other than money for her help and never helped her husband. The government paid for Bowers' transportation and child care, and, at times, she was transported in the government's car. Bowers testified that in exchange for her coop-

eration, the government agreed to try to get her husband's time cut or move him closer to home. Bowers testified that she helped the DEA in order to get help with her utility bills. Kelley Goodowens, DEA agent, testified that Bowers was paid by the DEA $840 in 1982, $2,900 in 1983, and $2,450 in 1984. These payments were for gas, baby sitting, transportation, and utility bills.

Counsel for Christian attempted to question Bowers about some state drug charges against her and her husband initiated prior to her assistance and later dropped. Bowers testified, out of the presence of the jury, that there was no connection between these cases and her assistance. The court refused to allow examination before the jury on the ground that Christian could establish no connection between Bowers' assistance and dropping of the charges. Christian and Davis moved the court to allow further inquiry into the prior charge against Bowers pursuant to Fed.R.Evid. 608(b), but the motion was denied. Defendant Christian proffered the evidence of other crimes he sought to introduce to impeach Bowers. Larry Barnes, detective sargeant for the Franklin Police Department, testified that he met Tyrone and Virginia Bowers in September 1981 regarding an investigation of the two for selling "T's and Blue's." Barnes indicated that a controlled buy was made from Virginia Bowers.

Ramona Bell, special agent with the FBI, testified that she and Bowers met Edmondson and Voorhies in setting up the buy from Davis. Bell was not present at the transaction but testified that she gave Bowers $200 and received a package in return. On September 22, 1983, Bell called Edmondson and asked him to set up a buy. Bell went to Edmondson's apartment where Christian called and directed them to meet him at Wyndell Voorhies'. Bell stayed in the car, Wyndell came out and said "Harry is in there waiting for you," and Edmondson went in. Edmondson returned to the car, was given $450 by Bell, returned to the house, then brought the

package of heroin to the car. As they left, a black male came out of Voorhies' apartment. Bell testified that she saw that individual in court. "He's seated to my right. He's wearing a tan and rust colored sweater over the top of a blue and white striped shirt." Edmondson gave Bell a telephone number to call for future transactions.

On December 13, 1983, Bell contacted Edmondson for help in reaching Christian. Bell and Edmondson drove past Christian's house, but Christian, in a car outside, motioned them to leave. They agreed to meet at Voorhies' apartment. Edmondson and Bell met Christian, and Bell paid Christian $1,300. Christian left, then later returned and gave Edmondson the heroin. Bell later bought heroin again from Voorhies. Bell indicated that she never saw Christian hand Edmondson anything, only that, when a horn blew, Edmondson went outside, and the next time she saw him, minutes later, Edmondson had the heroin. Edmondson told Bell that Christian gave him the heroin.

William Tucker, DEA agent, followed Bowers and Edmondson on June 28, 1982 and received the heroin. Tucker saw Johnson go into the house, then he came out and went with Bowers to Ed's Pizza. Nothing in Tucker's or his partner's report confirms Bower's story that Johnson retrieved anything from a brown-colored car on the scene. Bowers was also followed on June 28, 1982 by Agent Bernard Redd.

Henry Edmondson testified that he pleaded guilty to each charge and had no plea agreement. Edmondson testified that he used heroin, and that he helped Ramona Bell get heroin about 12 or 14 times because Bowers called him and asked him to make some purchases for her. Edmondson corroborated Bell's testimony regarding the purchase of heroin for $450 from Christian. Edmondson testified that he received the heroin from Christian and gave Christian the money. Edmondson helped Bell buy heroin for $1,300 from Christian on December 13, 1983. Edmondson testified that he knew Christian for about eight or nine years and that the last purchase of

brown heroin took so long because Christian said he had to wait for Joe Davis to get off of work. Edmondson confirmed Bell's version of the September 22, 1983 buy. During Edmondson's testimony the following exchange took place:

Q. [Mrs. Solomon, Christian's counsel] Now, is it not true that you have also been indicted for some—

THE COURT: Sustain the objection.

MRS. SOLOMON: I'm sorry.

THE COURT: Ladies and gentlemen of the jury, you will absolutely disregard anything about indictment. That's improper. It's absolutely improper. On your oaths you will strike that from your mind.

Let counsel approach the bench.

(Conference at the bench.)

THE COURT: That's a cheap, dirty trick, you it is. You're not going to pull that stuff in my court. You understand that?

MRS. SOLOMON: Yes, sir.

THE COURT: You do it one more time, and I'll work on you. Step back. Don't tell me you didn't know the difference.

MRS. SOLOMON: May I ask about jumping off the cliff for the cocaine? That's what I was getting at, I forgot, I just didn't order it right.

THE COURT: Ask him what?

MRS. SOLOMON: He testified about when they caught him with cocaine he jumped off the cliff with the cocaine, and I just accidentally said indictment. That's the one in Court right now. I was going to ask him about the circumstance.

THE COURT: That's the one that's already been mentioned?

MRS. SOLOMON: Yes, sir.

THE COURT: Ladies and gentlemen, I was wrong, it's one of the indictments that have been testified about. I apologize to Mrs. Solomon.

(End of Bench Conference.)

Regarding the September 1983 transaction, Edmondson testified that the money exchange took place with Edmondson and

Christian standing outside the car in which Bell sat. Edmondson testified that Christian left, and Edmondson and Bell waited in the car. Christian returned to the house, Edmondson was called in and Bell waited in the car. The heroin exchange took place in the house.

The instructions to the jury included the following:

Proving a case by circumstantial evidence is like identifying the criminal by the tracks he left behind, proving the facts which show the criminal.... The track which the criminal left if circumstantial evidence is relied upon, may be so clear and distinct as to point beyond a reasonable doubt as to his guilt. On the other hand, may be so obscured and faint that it does not identify the criminal....

On July 31, Davis and Christian were found guilty on all counts. On September 6, 1984, Christian was sentenced to thirty years on each count to run concurrently, to a 10-year special parole term on Counts 2, 4 and 8, and a $200,000 fine.

A sentencing hearing for Davis was held on November 27, 1984. Davis did not object to the presentence report but Davis denied participation in the crimes for which he was found guilty. Davis indicated that Bell and Bowers lied. Counsel for Davis stressed that the evidence against Davis was not overwhelming and that Bowers was a paid government agent. Further, Davis had been employed all his life and had no criminal record. The government argued that Davis was a major dealer and requested a "five-ten year range minimum plus special parole term." A further hearing was held on December 13, 1984. Bowers testified regarding the July 18, 1983 buy. Bowers testified that Voorhies said that the dope would come from Joe after he got home after 3 p.m. and that Edmondson said that Joe was fixing up the dope. Bowers went behind the apartment with Voorhies and Davis, gave Voorhies the money, Voorhies gave the money to Davis, and Davis gave the heroin to Voorhies. Bowers identified Davis as the defendant present at the hearing. Edmondson testi-

fied that Voorhies reported to him his conversations with Davis.

The government presented a debriefing of a confidential informant. Relative to Davis, the debriefing provided:

The CHRISTIAN organization is composed of the head of the organization identified as JOE (Joe DAVIS).

... [A]ssessment of the CHRISTIAN organization is that JOE LNU is the head of the organization and is the major connection to the brother JAMES from CHICAGO.

[The informant] described JOE as the "head of the clan" and that he lives on 24th Street just off Buchanan Avenue in North Nashville. He stated that Joe was currently driving a brand new Park Avenue Buick.

It was determined that Voorhies would not testify due to his plea agreement. In response to Davis' request for bond, the court stated:

He's been guilty of slow murder and he's being taken into custody right this minute. There has been many of these people in the drug business that's been getting away with murder....

Davis was sentenced to ten years on each count to run consecutively with a special parole term of five years on Count 3.

On April 2, 1985, Davis moved for a new trial pursuant to Fed.R.Crim.P. 33 or a writ of error coram nobis alleging that the government had failed to disclose a letter written by Assistant U.S. Attorney William M. Cohen to Special Agent Benny Crosby of the Secret Service. The letter, dated June 7, 1982, states: "Please be advised that the United States Attorney's office is declining prosecution of Ms. Bowers inasmuch as she has cooperated with agents of the Drug Enforcement Administration in connection with an investigation being conducted by them."

The affidavit of Ross E. Alderman, Assistant U.S. Attorney, indicates that the government was aware of the letter, and questioned Bowers about it. Bowers indicated, however, that the Secret Service in-

vestigation was dropped due to insufficient evidence rather than her DEA cooperation. On April 8, 1985, the distict court denied the motion. On appeal, Christian and Davis raise the following ten assignments of error.

## II.

■ Davis moved for a new trial pursuant to Fed.R.Crim.P. 33.[1] "To obtain a new trial, a defendant must satisfy four criteria. The evidence: (1) must have been discovered after trial, (2) must not have been discoverable earlier in the exercise of due diligence, (3) must be material and not merely cumulative or impeaching, and (4) must be likely to produce an acquittal if the case were retried." *United States v. Scaife*, 749 F.2d 338, 349 (6th Cir.1984). "The district court's decision not to grant a new trial is reviewable only for abuse of discretion." *Id.*

In *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court noted that "[t]he holding in *Brady v. Maryland*, requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or punishment.'" *Id.* 105 S.Ct. at 3379. Under the *Brady* rule, based on due process, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* at 3380 (footnote omitted). The Court rejected "a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant." *Id.* at n. 7. The *Brady* rule applies to any evidence, whether exculpatory or impeachment, which, "if disclosed and used effectively [ ] may make the difference between

conviction and acquittal." *Id.* at 3380. The Court held that:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 3384.

Even assuming that the document were admissible, there is substantial evidence in the record emphasizing Bowers' relationship with the government and the prospects of inducement for her testimony. Over three years, Bowers was paid about $7,000 and the government promised to attempt to help her husband who was incarcerated in federal prison. Even though Bowers was admittedly a key witness, on this record, there is no reasonable probability that the outcome of the trial would have been different had the defense had the document in question. Because the letter could not reasonably be construed to "make the difference between conviction and acquittal," the decision of the district court denying the new trial motion is affirmed.

## III.

■ Appellants principally challenge the sufficiency of the evidence on the conspiracy count. 21 U.S.C. § 841(a)(1) provides in pertinent part that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, a controlled substance." The elements of possession with intent to distribute are (1) knowing (2) possession of a controlled substance (3) with intent to distribute. *United States v. Dreyfus-de Campos*, 698 F.2d 227, 229 (5th Cir.), *cert. denied*, 461 U.S.

---

1. Rule 33 provides in pertinent part:
   The court on motions of a defendant may grant a new trial to him if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.

*See United States v. Blanton*, 697 F.2d 146 (6th Cir.1983). Christian also attempts to argue that he is entitled to a new trial on the same ground as Davis. However, nothing in the record before us indicates that Christian has sought a new trial or that the district court has denied such. Accordingly, this issue is properly before the court only with respect to defendant Davis.

937, 947, 103 S.Ct. 2107, 2128, 77 L.Ed.2d 1306 (1983). 21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

■ In drug conspiracy cases pursuant to 21 U.S.C. § 846, the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it. *Id.; United States v. Dempsey,* 733 F.2d 392, 396 (6th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984) (not necessary to charge and prove overt act in § 846 prosecution). "Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." *United States v. Garcia,* 655 F.2d 59, 62 (5th Cir.1981). Mere presence at the crime scene is insufficient. *United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir. 1983) ("Although mere presence alone is insufficient to support a guilty verdict, presence is a material and probative factor which the jury may consider in reaching its decision."). "Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982). "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." *United States v. Batimana,* 623 F.2d 1366, 1368 (9th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). A defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances. *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982). Further, "[a] conviction will not be reversed for lack of evidence that a defendant ... knew each detail of the conspiracy." *Id. See generally United States v. Ayotte,* 741 F.2d 865 (6th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984).

■ In reviewing the sufficiency of the evidence, we determine whether "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). With respect to Davis, Bowers testified that she purchased heroin from Davis through Voorhies and Edmondson. Bowers was referred to Davis by Voorhies and Edmondson and all four was present at the July 1983 transaction. Davis refused to deal one-on-one with Bowers and knowingly involved his compatriots in the scheme. Edmondson testified that Christian said he had to get the heroin for the December 1983 transaction from Davis. It is clear that Davis was part of the conspiracy in this case.

■ Christian is likewise tied to the conspiracy. Christian is implicated through testimony that Christian went to get heroin from Davis, and that Edmondson arranged transactions between Bell and Christian. The convictions are supported by sufficient evidence.

### IV.

■ Fed.R.Evid. 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." This court has held that

> before the government can take advantage of the coconspirator exception to the hearsay rule, it must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the

course and in furtherance of the conspiracy.

*United States v. Vinson*, 606 F.2d 149, 152 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 319 (1980). The court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Id.* at 153. The court may consider the hearsay statements themselves in deciding the preliminary question of admissibility. *Id.* If the court finds that the government failed to meet its burden "it should, on defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice." *Id.* (footnote omitted). *See United States v. Luce*, 713 F.2d 1236, 1242 (6th Cir.1983), *aff'd,* —— U.S. ——, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

▮▮▮ Appellants first challenge Bowers' testimony that John Johnson told her that the house which Edmondson entered was "Harry's house." Christian argues that this "was casual conversation and not in furtherance of the conspiracy." This argument has no merit. Identification of the location where the buy would be consummated clearly is in furtherance of the conspiracy. Second, Christian challenges Bowers' testimony that Johnson told her that Harry Christian's dope was not any good. Johnson apparently wanted to take Bowers to Curtis Christian. This statement was admissible as a coconspirator statement simply because it was part of the general discussion of how to acquire drugs.[2] Third, the appellants challenge Bell's testimony that Edmondson told her that Voorhies told him that Christian was waiting in the house. This is a double-hearsay situation—Voorhies to Edmondson and Edmondson to Bell. Both statements were made to facilitate the drug transaction and therefore made in furtherance of the conspiracy, and both were made by coconspirators. Accordingly, there was no error in admitting the statement.

### V.

Appellants challenge the trial court's limitation on their cross-examination of witness Bowers with regard to the dismissal of her state drug charge.

The constitutional basis for the right to cross-examine was persuasively delineated in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) where the Court stated:

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harrassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness.

*Id.* at 316, 94 S.Ct. at 1110.

However, it is within the discretion of the trial judge to limit the scope of cross-examination. *United States v. Ayotte*, 741 F.2d 865, 871 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984). A trial judge may limit cross-examination where interrogation becomes repetitious or unduly harassing, *United States v. Pritchett*, 699 F.2d 317, 321 (6th Cir.1983), where the cross-examination is irrelevant to the

---

**2.** Even if admission of the statement was erroneous, as not in furtherance of the conspiracy, the error is harmless beyond a reasonable doubt. The statement indicates that Christian dealt in drugs, but other direct evidence of such dealing was so overwhelming that the alleged hearsay added little to the case.

credibility of the witness, *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977); *McKinzy v. Wainwright,* 719 F.2d 1525, 1529 (11th Cir.1983), or to protect the witness' constitutional immunity from self-incrimination, *Hoover v. State of Maryland,* 714 F.2d 301, 305 (4th Cir.1983). However, "[a] trial court may limit cross-examination only after there has been permitted, as a matter of right, a certain threshold level of cross-examination which satisfies the constitutional requirement." *Niziolek v. Ashe,* 694 F.2d 282, 289 (1st Cir.1982).

"In determining whether a trial judge has abused his discretion in the curtailment of cross-examination of government witnesses, the test is whether the jury was already in possession of sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980); *Stevens v. Bordenkircher,* 746 F.2d 342, 347 (6th Cir.1984); *United States v. Touchstone,* 726 F.2d 1116, 1123 (6th Cir. 1984).

> Once an appellate court concludes that a trial court's abuse of discretion has violated the confrontation clause, the court must then consider whether the constitutional error is harmless beyond a reasonable doubt.... [F]ailure to permit cross-examination of a *key* government witness concerning bias, prejudice, or motive cannot be construed reasonably as harmless error.

*Stevens v. Bordenkircher,* 746 F.2d 342, 347 (6th Cir.1984).

▮▮ Applying these standards, it is clear that the district court's failure to allow cross-examination on the state charge does not require reversal. The defendant planned to inquire into the reason for dismissal of the charges. "[A]lthough a witness's credibility generally cannot be impeached by showing arrest, indictments or other acts of misconduct not resulting in

a conviction, acts demonstrating a basis for bias and prejudice may be explored to a reasonable degree." *United States v. Baker,* 494 F.2d 1262, 1266 (6th Cir.1974). The district court refused to allow defense counsel to inquire about the existence of the state charge, its disposition, or any connection of the dismissal of the charge with Bowers' cooperation in this case. While these inquiries would clearly be relevant to Bowers' potential bias, other evidence regarding her credibility was introduced. There was evidence that the government was paying Bowers and that she hoped to help her husband by her cooperation. While we reaffirm the Sixth Amendment principle that cross-examination, regarding bias should be given the greatest possible scope, the aggressive attacks on Bowers' credibility by defense counsel put the jury in possession of sufficient information by which to appraise Bowers' credibility, and, accordingly, the district court's limitation was not an abuse of discretion. Further, even if such an abuse could be found on this record, the attacks on Bowers' credibility and other evidence in the case, convince us that such error is harmless beyond a reasonable doubt.

## VI.

Appellants contend that the court erred in failing to give the jury a limiting instruction regarding the use of Edmondson's testimony with respect to his guilty pleas.

▮▮ Fed.R.Evid. 105 provides that "the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Any objection to lack of instruction was waived by defendant's failure to make timely request for a limiting instruction. *United States v. Regner,* 677 F.2d 754, 757 (9th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 220, 74 L.Ed.2d 175 (1982). "Moreover, an improper jury instruction will rarely justify reversal of a criminal conviction when no objection has been made at trial, ... and an omitted or incomplete instruction is even less likely to justify reversal, since such an

instruction is not as prejudicial as a misstatement of the law." *United States v. Hook*, 781 F.2d 1166, 1173 (6th Cir., 1986). Accordingly, we can reverse only for plain error affecting substantial rights. Fed.R. Crim.P. 52(b).

■ It is clear that a guilty plea of a codefendant may not be received as substantive evidence of a codefendant's guilt, but may properly be considered as evidence of a witness' credibility. *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir.1981). "[U]nder proper instruction, evidence of a guilty plea may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witnesses the government asks them to believe." *Id.*

As a result of plea bargaining, it is often the prosecution which produces a codefendant and elicits testimony tending to show the substantive guilt of the defendant. This is, of course, admissible. As a part of that testimony, the trier of fact should know the witness' total connection to the defendant or to the event; such information may not have been learned from a reading of the indictment or in the opening statements of counsel. Thus, when the prosecution examines the codefendant as its witness in support of its case-in-chief, a question about the guilty plea is legitimate as the purpose is to support the reasonableness of the witness' claim to firsthand knowledge because of admitted participation in the very conduct which is relevant. The fact a witness has formally admitted personal responsibility enhances the circumstances adding up to that witness' believability.

The prosecutor may also wish to place the plea before the jury so as to blunt defense efforts at impeachment and dispel the suggestion that the government or its witness has something to hide. Or, and we engage in no delusions about prosecutorial altruism, the prosecution may simply want the jury to recognize who the witness is, take the testimony as

it is, and give a fair evaluation, blemishes and all.

*Id.* at 1005.

In the absence of a request by defense counsel for a limiting instruction, the failure of the trial court to give one is not reversible error. *United States v. Ojukwa*, 712 F.2d 1192, 1194 (7th Cir.1983); *United States v. DeLucca*, 630 F.2d 294, 299 (5th Cir.1980), *cert. denied*, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981). "Only in those rare situations in which other 'aggravating circumstances' have exacerbated the prejudice will the failure to give cautionary instructions result in plain and reversible error." *Id.* The giving of a cautionary instruction is but one factor to consider. "The prevailing inquiry is one of fairness and to this end, jury instructions are important only insofar as they protect the substantive rights of the accused." *Id.* at 298. Among other factors to be considered are the way in which the plea is brought to the jury's attention, the purpose for introducing the plea, undue emphasis on the plea as it relates to the substantive aspects of the case, and counsel's approach to the use of the plea. *Id.* at 299; *United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 341, 83 L.Ed.2d 276 (1984).

■ It is clear that "[a] guilty plea entered by a codefendant can be especially prejudicial if the plea is made in connection with a conspiracy to which the remaining defendants are charged." *DeLucca*, 630 F.2d at 298. However, it seems that much of this potential for prejudice is negated when the pleading codefendant, such as Edmondson in this case, testifies regarding the specific facts underlying the crimes in issue. In such a case, it is reasonable to believe that the jury uses the testimony regarding the facts to convict the codefendants and the testimony regarding the guilty plea to assess the witness' credibility. Accordingly, in light of counsel's failure to request a cautionary instruction, the court's failure to give such an instruction *sua sponte* is not plain error.

## VII.

■ Christian argues that Agent Bell failed to properly identify Christian as the person about whom she was testifying. Bell identified Christian in court as:

He's seated on my right. He's wearing a tan and rust colored sweater over the top of a blue and white striped shirt.

There is no indication that Christian contended at that point that there was a question regarding Bell's identification or that Bell had not identified the person in court as the person with whom the alleged drug transaction had occurred. There is no merit to this assignment of error.

## VIII.

■ During cross-examination, the district judge severely criticized defense counsel in a conference at the bench regarding her questioning. The district judge then apparently realized that he was incorrect and said "Ladies and gentlemen, I was wrong, it's one of the indictments that has been testified about. I apologize to Mrs. Solomon [Christian's counsel]." The transcript then indicates that the bench conference ended. Apparently, the apology was addressed to the jury, although it is unclear from the record how much of the bench conference the jury heard. Christian contends that the court erred in failing to instruct the jurors that they were to draw no adverse inference against Christian in light of the court's criticism of Christian's counsel.

"When comments of the trial court exceed the boundaries of fair discipline by official disparagement of counsel or of a litigant's case, then error must follow." *United States v. Porter*, 441 F.2d 1204, 1213 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 241, 30 L.Ed.2d 184 (1971). "[E]rror is not harmless if there is a 'reasonable possibility' that the matter complained of might have contributed to the conviction." *Id.* at 1215. Whether the error is prejudicial can be measured by the strength of the state's case and the focus of the judge's comments. The district court's comments in this case do not require reversal. The case against both defendants was strong, the judge's comments were directed toward the conduct of counsel not toward the defendants, and the court's apology to counsel rendered the likelihood of prejudice remote.

## IX.

■ Christian contends that the fact that he appeared in custody before the jury denied him a fair trial. "Although security measures may deprive a defendant of some of the physical indicia of innocence, generally 'the degree of security exercised over the person of the defendant is within the trial judge's discretion.'" *Payne v. Smith*, 667 F.2d 541, 544 (6th Cir.1981), *cert. denied*, 456 U.S. 932, 102 S.Ct. 1983, 72 L.Ed.2d 449 (1982). There is no evidence that Christian was shackled or dressed in jail clothing. *Id.* The district court did not abuse its discretion and Christian was not deprived of a fair trial.

## X.

■ It is a well settled proposition of law that sentencing is addressed to the sound discretion of the trial judge. Davis argues that the district court erroneously relied on hearsay and Davis' denial of guilt in sentencing. Defendant also points out the small amount of heroin involved in the transaction in which he was involved. This fact, however, ignores the reality that he was convicted as a member of a conspiracy in which much heroin was sold. Davis either cites no authority for his arguments or cites inappropriate authority. The sentence in this case was not an abuse of discretion.

## XI.

■ Christian and Davis allege that the district court erred in using the word "criminal" in the jury charge on circumstantial evidence. We perceive no error in the charge set forth *supra* at 209.

Accordingly, the judgments of the district court are AFFIRMED.