946 F.2d 896
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James J. RUMLER, Defendant-Appellant.
 No. 91-1071.
 United States Court of Appeals, Sixth Circuit.
 Oct. 4, 1991.
 
 Before MERRITT, Chief Circuit Judge, RALPH B. GUY, JR. and SILER,* Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, James J. Rumler, was convicted by a jury of conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952(a) and 963. He is serving a seven-year sentence. A panel of this court affirmed defendant's conviction on direct appeal. Rumler now appeals from the decision of the district court denying his motion for a new trial on the basis of newly discovered evidence under Federal Rule of Criminal Procedure 33. For the reasons that follow, we affirm.
 
 I.
 
 2
 In the decision issued in Rumler's direct appeal, this court set forth the following events leading to Rumler's indictment:
 
 
 3
 The indictment charged that the conspiracy occurred between July and September of 1986 in the Eastern District of Michigan and other locations inside and outside the United States. Early in 1986, Rumler got together with a licensed pilot named Robert Whiting, who had just been arrested in Georgia on state charges of cocaine possession. Rumler asked Whiting whether he would fly planeloads of marijuana out of Jamaica. J.A. at 85-87. After extensive discussions, the two men went to Chattanooga, Tennessee, where Rumler bought an airplane for $59,000 cash. They agreed to fly to Jamaica and load the plane with bales of marijuana, which they would drop out of the plane to waiting speedboats in the Bahama Islands. Whiting was to receive from co-conspirator-ringleader Jesse Harget $300,000 for ten of these expeditions. J.A. 99-101.
 
 
 4
 The first trip, for which Whiting got a $5,000 advance, failed. He and Rumler flew in July to a remote airstrip in Jamaica to pick up a load of marijuana, but Jamaican officials impounded the plane because Whiting and Rumler could not prove ownership. They tried again in August, this time successfully obtaining several large bales (1,800 pounds) of marijuana wrapped in plastic. While flying over Andros Island (off Cuba's northern coast) en route to the states, Rumler threw the bales out of the plane to be picked up by waiting speedboats. Rumler and Whiting made a third trip in late August, this time flying from Florida to Bimini and then on to Jamaica, where again they filled the plane with bales of marijuana (2,000 pounds), which they dropped off into the sea somewhere in the Beery Islands (southeast of Florida). Harget refused to pay Whiting for this trip, claiming that the load was ripped off. In September, Rumler met with Whiting several times in a Michigan tavern to discuss further trips to Jamaica, but Whiting declined when he learned that Harget would not pay him in advance. J.A. 130.
 
 
 5
 United States v. Rumler, No. 89-1341, slip op. at 1-2 (6th Cir. Feb. 8, 1990).
 
 
 6
 Although the government produced three witnesses at trial, Whiting's testimony was crucial to the jury's conviction of Rumler. He described to the jury how Rumler sought him out, how they purchased an airplane, and how they flew to Jamaica three times to pick up marijuana for transport as described above.
 
 
 7
 Whiting testified at trial under a grant of use immunity. The immunity agreement was disclosed to trial counsel and was the subject of cross-examination by defendant's trial attorney. Whiting was also examined and cross-examined concerning his guilty plea and deferred sentencing agreement in an unrelated state charge for possession of cocaine. This conviction, in the State of Georgia, arose out of an arrest in June 1986, immediately prior to Whiting's conspiracy with Rumler during the period of July through September 1986. In response to examination by the government, Whiting testified that he received no assistance from the federal government or the customs service related to his state conviction and sentencing. Whiting also testified that his first contact with the Drug Enforcement Agency (DEA) regarding the Rumler case occurred when he was subpoenaed by the grand jury that subsequently indicted Rumler:
 
 
 8
 Q. Okay. Now, how was it that you came to be involved in this case? I mean, did you contact federal drug officials, or did they contact you?
 
 
 9
 A. In this case--you mean--
 
 
 10
 Q. (Interjecting) Relative to Mr. Harget and Mr. Rumler.
 
 
 11
 A. Oh. How did I? I was contacted by DEA.
 
 
 12
 Q. Okay. In fact, you were served a subpoena, is that right?
 
 
 13
 A. I was subpoenaed. That's correct.
 
 
 14
 Q. And is that how you first became involved?
 
 
 15
 A. Yes, sir.
 
 
 16
 (App. 356).
 
 
 17
 After Rumler's conviction, the defense learned from Robert Whiting's brother, Neil Whiting, that both Neil and Robert had entered into a cooperation agreement with government agents in 1986. In an affidavit dated May 11, 1989, Neil Whiting alleged that he and Robert had signed an agreement to receive a delayed sentence on the charges arising from their arrest on June 23, 1986, in exchange for their cooperation with the Georgia Bureau of Investigation (GBI) and the DEA in setting up a scheme for the importation of drugs into Georgia. This affidavit, which asserted that Robert Whiting cooperated with the DEA and GBI while he was travelling with Rumler, formed the basis of Rumler's original motion for a new trial.[1]
 
 
 18
 Defendant's motion was denied without prejudice for lack of jurisdiction, as the case was pending on direct appeal. Subsequent to this court's affirmance of Rumler's conviction, Rumler renewed his motion for a new trial, alleging the following:
 
 
 19
 1. As previously argued, the newly discovered evidence in this case is the fact that prosecution witness Robert Whiting had been party to a cooperation agreement with the Drug Enforcement Agency (and with other law enforcement agencies) during the time the witness was supposedly associated with Defendant in the importation of marijuana; and
 
 
 20
 2. Whiting lied on the stand during his direct testimony when he asserted that his first association with the DEA had occurred when he was subpoenaed to testify; and
 
 
 21
 3. [T]he government knew, or should have known, that Whiting was testifying falsely in the course of the trial; and
 
 
 22
 4. [T]he government denied Defendant due process of law by concealing the existence of a cooperation agreement between Whiting and the DEA, thereby precluding an effective cross examination of the witness and concealing his status from both the Court and the jury; and
 
 
 23
 5. [T]he government continued to conceal and misrepresent [the] extent and nature of Whiting's involvement with the DEA by filing false and/or misleading affidavits with this Court in an attempt to preclude searching inquiry into the witness's credibility and the actions of government agents in this case.
 
 
 24
 (App. 156-57).
 
 
 25
 The district court held an evidentiary hearing on defendant's motion, where it was established that on September 19, 1986, Assistant District Attorney George Christian signed an agreement on behalf of the State of Georgia to dismiss the cocaine charges in their entirety if Robert and Neil Whiting would cooperate and successfully induce other drug dealers to buy more than five kilograms of cocaine or 300 pounds of marijuana in Georgia. Although the tentative agreement was with Georgia authorities for the disposition of Georgia charges and cooperation in a proposed investigation by the GBI, the DEA was also brought into the case for a single day. Accordingly, DEA Agent William Malarney attended the September 19, 1986, meeting and also signed the statement. This was Agent Malarney's only contact with the Whitings, and no information or cooperation regarding James Rumler was provided to Malarney.
 
 
 26
 Within two weeks after the proposed cooperation agreement was signed, the defense attorney for the Whiting brothers contacted Christian and stated that neither Whiting brother would deliver on the bargain. At the evidentiary hearing, Christian testified, "[t]hat was the end of it. Nothing was ever done on their end as far as carrying forward their part of the agreement." (App. 507). Agent Malarney, who had received a copy of the proposed agreement, was informed within two to three weeks that the Whitings had "backed out" of their cooperation agreement.
 
 
 27
 Because the Whitings did not cooperate as promised, the pending state case was not dismissed. Eventually, both Robert and Neil Whiting pled guilty to felony cocaine charges, and each received a seven-year probationary sentence based on the small amount of cocaine involved. Christian, who maintained an original copy of the unfulfilled agreement in his file, did not inform Detroit investigators of the agreement and provide them with a copy until January 1990.
 
 
 28
 At the conclusion of the hearing on defendant's new trial motion, the district judge found that the trial testimony of Robert Whiting was not perjured, false, or misleading. The court found that Robert Whiting had not, in fact, cooperated with the government during the period that he was involved in the drug conspiracy with defendant Rumler, and that Whiting had correctly testified that the first time he was contacted by the DEA in the Rumler-Harget investigation was when he received a subpoena. Concerning defendant's claim that the government denied him due process of law by concealing the existence of the cooperation agreement, the district court ruled as follows:
 
 
 29
 And the Court does not believe that the failure to disclose the existence of the September 19, 1986 agreement ... warrants the granting of a new trial. There is no evidence that Mr. Janice or anyone representing the government, in that case, in fact knew at the time Robert Whiting's testimony was presented in November of '88 of the existence of such agreement. In fact, based on the testimony that this Court has listened to today, that agreement was, in this Court's opinion, an insignificant document.
 
 
 30
 (App. 547-48). Accordingly, the district court denied defendant's motion for a new trial.
 
 II.
 
 31
 Motions for a new trial based on newly discovered evidence are disfavored, and a trial court's determination that a new trial is not warranted will not be reversed absent "clear abuse of discretion." United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984) (per curiam); see United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983).
 
 
 32
 The following elements must be established before a new trial will be granted: (1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal. Barlow, 693 F.2d at 966.
 
 
 33
 We first note that there appears to be no question that the cooperation agreement was discovered after Rumler's trial. Therefore, the first element has been established. Our disposition of the remaining issues establishes that defendant is not entitled to a new trial. Even if we were to assume arguendo that defendant's counsel acted with reasonable diligence and that the prosecution was guilty of suppressing evidence favorable to the defendant, Rumler would still be required to establish the final two elements of the Barlow test.
 
 
 34
 We note that the Barlow test is modified in cases involving the suppression of evidence by the prosecution, and, in such cases, the defendant "should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." United States v. Agurs, 427 U.S. 97, 111 (1976). Rather, Agurs requires only a showing of materiality, and the test of materiality depends on the nature of the evidence and the type of request made by the defense in the attempt to discover the exculpatory evidence before trial.
 
 
 35
 However, as we explained in United States v. O'Dell, 805 F.2d 637 (6th Cir.1986), cert. denied, 484 U.S. 859 (1987):
 
 
 36
 [A]gurs has been modified by the Supreme Court's decision in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), in which the Court adopted two standards for determining the materiality of evidence withheld by the prosecution. Bagley suggests that, in cases involving the knowing use of perjured testimony by the prosecution, the conviction will be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. at , 105 S.Ct. at 3382 (citing Agurs, 427 U.S. at 103, 96 S.Ct. at 2397). However, in cases involving no requests for exculpatory material, a general request, or a specific request, the evidence will be considered material and the conviction set aside "only if there is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at , 105 S.Ct. at 3384.
 
 
 37
 O'Dell, 805 F.2d at 641.
 
 
 38
 Defendant contends that the instant case should be analyzed under the first standard adopted in Bagley because his conviction was obtained by the use of evidence that the prosecution knew was false. This contention is without merit. In order to prevail on his claim that his conviction was obtained with the use of evidence that the prosecution knew or should have known was false, "the moving party must show '(1) the statements were actually false; (2) the statements were material ... and (3) [the] prosecution knew they were false.' " United States v. Chagra, 735 F.2d 870, 874 (5th Cir.1984) (citation omitted). Because we agree with the findings of the district court--that Whiting's testimony was not false and that, in any event, the government was not aware of the cooperation agreement during trial--Rumler failis to meet the first and third prongs of this test.
 
 
 39
 Accordingly, defendant's motion for a new trial will be evaluated under the second standard announced in Bagley, which mandates reversal of his conviction "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682. See United States v. Christian, 786 F.2d 203 (6th Cir.1986). In connection with this standard, defendant argues that the evidence used to convict him was highly circumstantial and that evidence destroying Whiting's credibility would have created a reasonable doubt as to guilt in the minds of the jurors. See, e.g., United States v. Butler, 618 F.2d 411, 421 (6th Cir.), cert. denied, 447 U.S. 927 (1980).
 
 
 40
 In the final analysis, we conclude that disclosure of Whiting's unfulfilled cooperation agreement "could not reasonably be construed to 'make the difference between conviction and acquittal....' " Christian, 786 F.2d at 210 (quoting Bagley, 473 U.S. at 676). The evidence supporting an inference of Rumler's involvement in the conspiracy is substantial. Furthermore, defendant has not demonstrated that Whiting ever cooperated with either state or federal officials during the 1986 conspiracy, or even attempted to implement the cooperation agreement. To the contrary, the evidence indicates that the cooperation agreement only briefly existed, if at all, as Whiting disclaimed the agreement through his attorney soon after he signed it. Finally, Whiting's credibility was thoroughly attacked at trial when he was cross-examined about his immunity agreement in the Rumler case and his guilty plea and deferred sentencing agreement in the unrelated state case. Our review of the record in this case supports the conclusion that the district court did not abuse its discretion in denying a new trial, as there is no reasonable probability that disclosure of the evidence would have produced a different result.
 
 
 41
 AFFIRMED.
 
 
 
 *
 The Hon. Eugene E. Siler, Jr. became a Circuit Judge on September 16, 1991
 
 
 [1]
 This affidavit was filed with defendant's original motion for a new trial by trial counsel, Jerome Susskind, who was later indicted for obstruction of justice. The indictment was premised upon Susskind knowing that information in the affidavit was false